**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| JONATHAN EDWARD LITTLE, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. |
| CITY OF FRIENDSWOOD and SARA | § | _____ |
| CARTER, | § | |
| | § | |
| *Defendants*. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff **JONATHAN EDWARD LITTLE** (hereinafter referred to as "Plaintiff"), and files this Original Complaint against Defendants **CITY OF FRIENDSWOOD** (hereinafter referred to as "Defendant City" or the "City"), and **SARA CARTER** (hereinafter referred to as "Defendant Carter" who together with Defendant City are collectively referred to as the "Defendants"). In support of such, Plaintiff would show the Court as follows:

### I.      STATEMENT OF THE CASE

1.      This is an action for damages brought under 42 U.S.C. § 1983 against Defendants. Defendant City's pattern-or-practice is to, without reasonable suspicion or probable cause, stop citizens, conduct illegal searches, conduct unwarranted field-sobriety tests, submit tainted affidavits to independent intermediaries, to falsely arrest citizens, and to conduct perfunctory internal affairs investigations into its officers who do the same as well as not hand over *Brady* material to city prosecutors concerning the credibility of arresting officers. Plaintiff can plausibly show the same with reference to a pattern of over twenty-seven specific incidents.

1

2.      As a result of that pattern-or-practice as established through a series of incidents, Plaintiff's clearly established constitutional rights were violated.  Indeed, at all times relevant, Defendant Carter was acting pursuant to that pattern-or-practice when she, without probable cause or reasonable suspicion, stopped the Plaintiff, conducted a field-sobriety test without a reason to do so, searched his vehicle without a warrant, failed to mirandize the Plaintiff, submitted a tainted affidavit, and/or falsely arrested the Plaintiff as she and other officers in the City have routinely done so since doing so is the City's pattern-or-practice.

3.      The City allows its officers, like Defendant Carter, to do so because it conducts only merely perfunctory Internal Affairs investigations into those officers and then puts them back onto the streets to violate the clearly established rights of civilians.  Indeed, for four (4) years preceding the incident, the Defendant City held onto and covered up an investigation into Defendant Carter's and other officers' untruthfulness and routine baseless traffic stops.

4.      As a result, the Galveston District Attorney has been prompted to dismiss nearly thirty (30) DWI cases, and another 230+ arrests by Defendant City are currently under review. Beyond those raw numbers, Plaintiff specifically pleads well-over twenty-seven (27+) incidents in which similarly situated civilians had their clearly established constitutional rights violated in the same way that the Plaintiff did during this same relevant time period.  Moreover, in this case, attribution of municipal liability to Defendant City can be established in other ways as well.

## II.      JURISDICTION AND VENUE

5.      This action is brought pursuant to 42 U.S.C. §1983 and §1988 and the Fourth Amendment to the United States Constitution, made applicable to the Defendants through the Fourteenth Amendment to the United States Constitution.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 1983, and 42 U.S.C. § 1988.  Additionally, the

Honorable Court has supplemental jurisdiction over the Plaintiff's state law claims.  28 U.S.C. § 1367.  Venue is proper in this Court pursuant to § 1391(b) because the incident in question, particularly the false arrest giving rise to this action, took place in Harris County, Texas, within the Southern District of Texas.

### III.    PARTIES

6.    Plaintiff **JONATHAN EDWARD LITTLE** is a resident of Texas.

7.    Defendant **CITY OF FRIENDSWOOD** (is a municipal corporation organized under the laws of the State of Texas.  At all times relevant hereto, the City, through the Friendswood Police Department (or "FPD"), was responsible for the policy, practice, supervision, implementation, and conduct of all FPD matters and was responsible for the appointment, training, supervision, discipline and retention and conduct of all FPD personnel.  In addition, at all times here relevant, Defendant City was responsible for enforcing the rules of the FPD, and for ensuring that the FPD personnel obey the laws of the United States and the State of Texas.  The City may be served with process on its city attorney whose office is located at 910 S. Friendswood Drive, Friendswood, TX 77546.

8.    Defendant **SARA CARTER** is being sued in her individual and official capacity. She was, at all times relevant, employed as a police officer with the FPD.  Defendant Carter may be served with process at her place of employment as a police officer with the Friendswood Police Department, located at 1600 Whitaker Dr., Friendswood, TX 77546 or wherever she may be found.

### IV.    RELEVANT BACKGROUND

9.    On or around January 18, 2021, Plaintiff was driving in or around the 2900 Block of W. Parkwood Ave., Friendswood, Texas 77546, and came to be stopped at a red light.  At that

time and at all relevant times thereafter, Plaintiff had a constitutional right to be free from unreasonable searches and seizures or false arrests without probable cause.

10.     As Defendant Carter approached Plaintiff's vehicle from behind in a marked police vehicle, she activated her police lights.  At which time, Defendant Carter vulgarly and audibly remarked to herself and dispatch, "*You better f***ing stop.*"

11.     Then, with police lights activated behind his vehicle, Plaintiff calmly turned right and came to a complete stop.  Other than driving in Friendswood, Texas and encountering Defendant Carter, like many other citizens, Plaintiff had done nothing wrong.

12.     In addition to Defendant Carter's marked Defendant City police vehicle, at least three (3) other marked police vehicles belonging to Defendant City joined in on the stop.  From which, at least two other officers joined Defendant Carter.   Both of these officers   knew that the custom, policy or practice of Defendant City is to stop vehicles without reasonable suspicion and probable cause, and thus so joined Defendant Carter in her wrongful stop.

13.     The first of these officers was Defendant City's Officer Milling.  Just prior, he was in a marked Defendant City police vehicle, on a perpendicular street in the left-hand turn.  From it, Officer Milling could see the Plaintiff's truck stopped at a red light and cars passing in front of it because those cars had a green light.  Despite this, Defendant Carter predatorily rapidly approached the Plaintiff with her police lights activated.  From this, that there was no reasonable suspicion or probable cause to stop the Plaintiff as he was only stopped at a stale red light.  Extrinsic video evidence from Officer Milling's police vehicle supports this version of events.

14.     The second of these officers was Defendant City's Officer AJ Rodgers.  His vehicle was behind that of Defendant City's Officer Milling on the perpendicular street, also in the left-hand turn lane.  From it, like the view from Defendant City's Officer Milling's vehicle, Defendant

City's Officer Rodgers can also see that the Plaintiff's truck stopped at a red light and cars passing in front of it because those cars had a green light.  Despite this, as to Defendant Rodgers as well, Defendant Carter can be seen predatorily rapidly approaching Plaintiff with her police lights activated.  From this, it is clear that Defendant City does not have reasonable suspicion or probable cause to stop the Plaintiff stopped before a stale red light.  Like the extrinsic video from Defendant City's Officer Milling's vehicle, extrinsic video evidence from Defendant City's Officer Rodgers' marked Defendant City police vehicle also supports this version of events.

15.    After doing a U-Turn, both Officer Milling and Rodgers' police vehicles came to be stopped behind Defendant Carter's vehicle which was stopped behind the Plaintiff's vehicle. Defendant Carter's vehicle had turned right after the Plaintiff had calmly done so when Defendant Carter had activated her police lights.  Like the videos from (a) Officer Rodger's vehicle and (b) Officer Milling's vehicle, the video from Defendant Carter's body camera is yet a third piece of extrinsic evidence that indicates that the colors of the light at the intersection are as Plaintiff claims.

16.    In any case, Officer Milling and Officer Rogers witnessed Plaintiff's interactions with Defendant Carter.  Both, however, did nothing but assist Defendant Carter, because the custom, policy or practice of Defendant City is to stop vehicles without reasonable suspicion or probable cause and then to arrest said individuals without reasonable suspicion or probable cause either, and then come up with a bogus reason later and after the fact.

17.    That said, after exiting her Defendant City's marked police vehicle, Defendant Carter then knocked on the Plaintiff's vehicle's drivers' side window, and asked the Plaintiff to turn off his truck.  As instructed, the Plaintiff then does so.  Defendant Carter also then asked the Plaintiff to hop out of his truck, and the Plaintiff thereafter also complied with this command.  The Plaintiff was then patted down.  After which, Defendant Carter requested that the Plaintiff give her

his wallet, and Plaintiff freely provided his wallet as ordered to do so.  Next, Defendant Carter asked Plaintiff if he has had anything to drink.

18.     To which, the Plaintiff truthfully responded with "*No, ma'am.*"  Extrinsic evidence also supports the truth of this statement as well, because the Plaintiff's blood would later be unconstitutionally taken, tested and the results would show no alcohol in his system.  Furthermore, at the time, there was absolutely no reason for Defendant City's officers to suspect that the Plaintiff had had anything to drink whatsoever and were just looking for an excuse to falsely arrest him.

19.     Plaintiff was then told to stand in a certain spot, and face Defendant Carter. Thereafter, the Plaintiff obeys both of these commands.  In a deceitful attempt to trick the Plaintiff, Defendant Carter asked the Plaintiff why his vehicle was stopped at the light.  To which, the Plaintiff responded that Defendant City's police vehicles were on the perpendicular road and had a green light to turn left, but never went.  Given so, at that time, it would have been unsafe for the Plaintiff to turn right while those police vehicles on the perpendicular street with the green turn light arrow turned left into the lane next to the Plaintiff's vehicle.

20.     Thereafter, Defendant Carter then asked the Plaintiff to take off his hat, and the Plaintiff did as instructed.  Without saying what she was doing, Defendant Carter then put a pen in front of the Plaintiff's face, and asked him to have his eyes follow it without moving his head. Without issue, Plaintiff diligently did so.  Although Defendant Carter thereafter moved the pen back and forth for an inordinate excessive amount of time, Plaintiff diligently followed Defendant Carter's pen with his eyes the whole time without any issues.

21.     It, however, is unclear why Defendant Carter even began to conduct a field sobriety test since there is no reasonable suspicion whatsoever to suspect that the Plaintiff has consumed

any alcohol whatsoever.  Then again, conducting bogus field sobriety tests on stopped or detained civilians is the pattern-or-practice of Defendant City.

22.     Next, when Defendant Carter stopped moving her pen back and forth, the Plaintiff's eyes, as instructed by Defendant Carter, remained on the still pen.  Defendant Carter then moved the pen in a circle, and the Plaintiff still diligently kept his eyes on it as he was instructed to do. Angry that the Plaintiff had passed her bogus tests, Defendant Carter then instructed the Plaintiff to put his hat back on, and he does so as he was ordered.

23.     Defendant Carter then asked the Plaintiff to move and stand on a spot that she has shined her flashlight upon, and the Plaintiff did so.  Defendant Carter then asks the Plaintiff to take a couple of steps forward, and the Plaintiff then does as so.  The Plaintiff was then asked to turn around, and he did so.  Defendant Carter then stated that she does not have a straight line, and that the Plaintiff should imagine a straight line on the ground.

24.     After which, the Plaintiff did as he was instructed.  The Plaintiff was then told to take nine steps forward, then turn around, and then take nine steps.  The Plaintiff did so without any issues whatsoever.  Thereafter, the Plaintiff was told to move to a spot where Defendant Carter has shined her light, and he perfectly did so.  After which, Defendant Carter told the Plaintiff to stand on one foot and count out loud until Defendant Carter told the Plaintiff to stop.  As requested, the Plaintiff also did this without any issues whatsoever.

25.     The Plaintiff was then told to turn around by Defendant Carter, and he did so. Defendant Carter then directed Defendant City's Officer Milling to arrest Plaintiff, and Defendant City's Officer Milling did so, because arresting individuals, like Plaintiff, without reasonable suspicion or probable cause during traffic stops after bogus field sobriety tests is a custom, policy or practice of Defendant City.

26.     During which, Defendant City's Officer Milling advised the Plaintiff to give him his left hand which the Plaintiff then did, and Defendant City's Officer Rodgers then requested the Plaintiff's right hand which the Plaintiff also freely provided it.

27.     At this point, the Plaintiff gently asked whether he is being arrested.  In response, either or both Defendant City's Officer Milling or Rodgers advised the Plaintiff that Defendant Carter will explain that to him in a minute.  After which of course, Defendant Carter comes up with and conjures up a false reason as to why they are arresting him which is also part of the customs, policies or practices of the Defendant City.

28.     Thereafter, the Plaintiff was handcuffed by Defendant City's Officer Milling and Rodgers.  That is because falsely arresting or detaining individuals like the Plaintiff without reasonable suspicion or probable cause after a traffic stop is too a custom, policy or practice of Defendant City, and this can be shown through a pattern of incidents detailed below.

29.     Defendant Carter then commanded the other two officers to search the Plaintiff's pockets which they then do.  During which, the Plaintiff calmly again asked, "*What am I being arrested for?*"  To which, either or both of Defendant City's Officer Milling or Rodgers then advised the Plaintiff that Defendant Carter will explain that to the Plaintiff shortly.

30.     Defendant Carter then stated to the Plaintiff that he was under arrest for an offense arising from actions related to operating a motor vehicle in a public place while intoxicated. Neither Defendant Carter, nor Defendant City's Officer Milling or Rodgers, however, ever read to the Plaintiff his <u>Miranda</u> rights, even though the Plaintiff was under arrest.

31.     Defendant Carter then advised Plaintiff that the offence relates to Section 106.041 of the Texas Alcoholic Beverage Code, and that Plaintiff will be asked for a specimen of breath or blood and that said specimen will be analyzed for alcohol concentration.  Defendant Carter also

advised that, if Plaintiff refuses, he will be subject to prosecution.  Again, finding reasons for a stop or arrest after-the-fact is the pattern-or-practice of Defendant City.  So too is not advising citizens of their _Miranda_ rights.

32.     Although Defendant Carter advised the Plaintiff that he was under arrest, she does not read the Plaintiff his _Miranda_ rights.  And, Defendant City's Officer Milling and Rodgers also do not read to the Plaintiff his _Miranda_ rights.  That is because, during bogus traffic stops, like this one, the custom, policy or practice of Defendant City was to not read to individual victims, like the Plaintiff, their _Miranda_ rights so that they may later make statements that should not be lawfully used for any purpose thereafter.

33.     In any case, Defendant Carter then requested a specimen, and the Plaintiff responded that he has "not been drinking" and that he does not understand why he is "getting messed with."   Make no mistake, these officers were, in fact, messing with the Plaintiff in accordance with the custom, policies or practice of the Defendant City that enables Defendant City's Officers, like Defendant Carter and the other two officers to detain or arrest individuals, like the Plaintiff, without reasonable suspicion or probable cause after bogus stops.

34.     Thereafter, the Plaintiff was thrown into the back of a Defendant City police vehicle.  Next, without a warrant, probable cause or even reasonable suspicion, Defendant Carter and Defendant City's Officer Milling and/or Rodgers began to search the Plaintiff's vehicle.  While tearing the vehicle apart during this unconstitutional search, Defendant Carter states that Plaintiff "_had forever and a day to hide something, he's a rodent._"  Conducting such illegal searches and/or such searches to find after-the-fact reasons to justify their unconstitutional conduct is a custom, policy or practice of Defendant City as will be established via a pattern below.

35.     The search, however, turns up nothing, because the Plaintiff, like many others subjected to the same or similar wrongful conduct in the prior months and years in Friendswood, TX by Defendant City, has actually, in fact, done nothing wrong whatsoever.

36.     Thereafter, Plaintiff was driven to the jail by Defendant Carter in a marked Defendant City police vehicle.  During which, Defendant Carter told Plaintiff that he is going to Friendswood, Texas.  She then took the Plaintiff to the Friendswood jail, because locking up individuals like Plaintiff for bogus traffic violations without probable cause or reasonable suspicion is the custom, policy or practice of Defendant City.

37.     Upon arrival, Defendant Carter then exited her vehicle and escorted Plaintiff into the jail.  As she took off Plaintiff's handcuffs, a fourth Defendant City's officer walked by, smiled, and laughed to the Plaintiff that Defendant Carter is Defendant City's DUI specialist.  Mostly everyone at the Pasadena Police Department knows that this is their pattern-or-practice, and Defendant Carter is the top performer of it.

38.     Thereafter, another one of Defendant City's Officers dressed the Plaintiff in a black and white jail uniform, and placed him a cell even though there was no reasonable suspicion or probable cause to do so at the time.  At this point, the Plaintiff has still not been read his *Miranda* rights even though he has now been dressed in a prisoner's uniform and placed in a cell.  That is because not reading *Miranda* rights is a custom, policy or practice of Defendant City.

39.     Defendant Carter then vulgarly states to Plaintiff, "*Remember that long a\*\* form that I read to you? You said that you would provide a specimen, still doing that?*"  To which Plaintiff freely offered to blow into a breathalyzer, but Defendant Carter refused, and wanted a blood specimen instead.  Defendant Carter then angrily left, and yelled, "*I'll be back*."  Conducting illegal blood searches too is a custom, policy or practice of Defendant City.

40.     Upon information and belief, Defendant Carter then prepared a tainted affidavit which contained false and/or wrongfully obtained testimony to take before an independent intermediary.  Allowing its officers to do so is also a custom, policy or practice of Defendant City. Despite repeated requests for the pre-litigation discovery of these affidavits submitted to the intermediary, Defendant City has refused to provide them to Plaintiff.

41.     Given so, upon information and belief, without all relevant material facts presently before it and based on that false and tainted information, a magistrate or judicial officer issued a tainted blood search warrant.  Pursuant to it, Plaintiff's body was forcefully and violently penetrated with a needle as his blood was taken from him against his will or consent.  Thereafter, a laboratory test of Plaintiff's blood was performed.

42.     Said lab report from the DWI Blood Kit revealed that the Plaintiff had no alcohol in his system.  Thereafter, however, Plaintiff would wrongly remain in jail for months.  During that time, the Plaintiff suffered significant mental and emotional trauma and lost everything. Adding further, his mother passed away during that time and he lost considerable income.

43.     Plaintiff remained in that jail because Defendant City's custom, policy or practice was to not give to prosecutors _Brady_ material which could impeach the credibility of its officers, like Defendant Carter.  Defendant City, its Chief of Police, and his delegates all knew or should have known that Defendant Carter is not a credible witness and had routinely bogusly stopped and falsely arrested many other civilians before then as well.

44.     In fact, at a public meeting before Defendant City's City Council on August 2, 2021, Defendant City's Chief of Police doubled down and outright stated that Defendant Carter did not violate department policy when she was first investigated back in 2017 for the same conduct since her actions were within department policy.  Moreover, Defendant City's Chief of

Police at that same public meeting implied that the judge who allowed Defendant Carter's impeachment material to come into evidence in another criminal case was influenced by political contributions by the criminal defense attorney rather than by the aim of justice.

45.     Then, at that same public meeting, one of Defendant's City Council Members touted publicly that Defendant Carter was "*awesome*" and "*incredibly professional*."  He even added, "*I support everything that you are doing*" while he looked at Defendant City's Chief of Police, and continued "*I have no problem with what your police force is doing*."

46.     After which, Defendant City's Mayor then publicly stated he "*echoes*" those exact same sentiments, and then, touted Defendant City's low crime rate and asked Defendant City's Chief of Police and his delegates to "*continue doing whatever they were doing*."  Defendant City's Mayor then added that he "*whole heartedly support*[s] *Officer Carter, we need people like that*."  To the contrary, people like that are not needed and they should not be supported by Defendant City's policymakers while civilians, like Plaintiff remained falsely arrested behind bars.

47.     Luckily, however, thereafter, on or around February 8, 2022, in Cause No. 21-CR-0211, *The State of Texas vs. Jonathan Edward Little*, in the 405th District Court of Galveston, Texas, the Assistant Criminal District Attorney filed a Motion to Dismiss and checked the "Other" box."  Below it, he or she wrote as follows: "**Explanation: Interests of Justice; Credibility issues with Friendswood Police Officer Sara Carter.**"  But again, the problem, however, is much larger than just that sole officer.  Rather, she was acting pursuant to pattern-or-practice of Defendant City, and the same was a moving force behind the Plaintiff's injuries.

48.     Moreover, preceding the Incident, for nearly four (4) years, Defendant City has held onto or covered up an investigation into Defendant Carter's and other officers' untruthfulness and baseless traffic stops.  Over the course of the prior four (4) years, Defendant Carter and other

officers continued working as patrol officers for Defendant City's police department. That is because conducting baseless traffic stops and providing untruthful testimony to justify false stops or arrests are among the customs, policies or practices of Defendant City. As is covering them up, and not handing over *Brady* material which could go to an officers' credibility like in this case.

49.    As further background, in 2017, an Internal Affairs investigation was opened concerning Defendant Carter. It followed a citizen complaint made by a fellow officer within the police department. That complaint focused on Defendant Carter's conduct in the course of her duties that undeniably showed her being untruthful regarding probable cause for traffic stops. During it, Defendant Carter touted to Defendant City's policymakers and their relevant delegates that she regularly stopped vehicles that were registered in other neighborhoods, observed them "*driving like saints,*" but pulled them over anyways because that is the custom policy or practice of Defendant City. That investigation found the following:

a.    First, Defendant Carter had made statements in the past about not having a reason to pull over a certain vehicle but did it anyway;

b.    Second, Defendant Carter explained that she made a 'mistake' by initiating a traffic stop and later released the driver, when in reality, a review of the video in the incident shows the driver was not released, and instead was actually arrested;

c.    Third, Defendant Carter detailed in a case that a traffic stop was conducted for a speeding violation, when in actuality, the video details that there was no speeding, and she later claimed the reason for her stop was because of incorrect license plates even though the license plates on the vehicle were not incorrect following the investigation; and

d.    Fourth, Defendant Carter being questioned by her superiors about the issues raised and admitting to conducting traffic stops on vehicles without probable cause around twenty (20) times.

These are the sort of things that Defendant City had a pattern-or-practice of keeping from falsely arrested individuals like Plaintiff who would remain in jail during the pendency of their case. Despite a mere perfunctory internal affairs investigation, Defendant City, its relevant

policymakers, and their delegates endorsed Defendant Carter's conduct and put her back on the streets with its officers who engage in the same pattern-or-practice.

50.     But before then, Defendant City, its policymakers, and their delegates then all had been on notice or should have known about at least eleven (11) incidents or should have known about them given the revelations from that still perfunctory internal affairs investigation:

  a. First, in or around late 2016, Defendant City's officers pulled over citizen Jack Swiggett without reasonable suspicion or probable cause while he was on his way home from work because doing so was their pattern-or-practice. At the time, all he was doing was driving with a spare tire which is not illegal. After which Defendant City's officers looked to manufacture reasonable suspicion or probable cause, asked him if he had illegal drugs in the vehicle to which he replied that he did not. Then again, searching for post-facto justifications to justify prior police misconduct is the pattern-or-practice of Defendant City and its officers.

  b. Second, on or around February 27, 2017, Defendant City's officers again falsely stopped a citizen Jack William Swiggett without reasonable suspicion or probable cause because, again, doing so is Defendant City's pattern-or-practice. While the pretextual reason of driving without valid insurance was provided to citizen Jack William Swiggett, he promptly then provided proof of his insurance and should have been released. Nonetheless, Defendant City's officers falsely arrested him anyways. That is because doing so is Defendant City's pattern-or-practice.

  c. Third, on March 18, 2017, Defendant City's officers falsely stopped a citizen James Curtis without probable cause or reasonable suspicion after having stopped him for unconfirmed insurance when it was actually confirmed. Doing so, after all, is the pattern-or-practice of Defendant City. Thereafter, Defendant City later falsely arrested him for possession of drug paraphernalia after-the-fact. Again, searching for post-facto retro justification for the violation of clearly established constitutional rights is the pattern-or-practice of Defendant City.

  d. Fourth, on or around April 18, 2017, Defendant City's officers again falsely stopped citizen James Curtis without probable cause or reasonable suspicion in the 5300 block of Appleblossom street. "*Got a meth head about to leave his house, want him bad,*" Defendant City's officers broadcast over the radio. Wanting him so bad and not having any reasonable suspicion or probable cause whatsoever, Defendant City's officer pulled him over again, asked if he had fixed insurance, and the driver immediately provided it. Using the false pretext of the smell of marijuana,

Defendant City's officers then conducted an illegal search of the vehicle, because doing so is also their custom, policy, or practice. After all, regularly violating civilians' clearly established constitutional rights in this manner is the pattern-or-practice of Defendant City.

e.    Fifth, on or around May 20, 2017 during the 02:57 hour, Defendant City's officers stopped a citizen, Zachary Morgan, who was lawfully driving his Ford F-150 in the 100 block of North Friendswood Street. Again, pulling over lawfully driving civilians without reasonable suspicion or probable cause is the pattern-or-practice of Defendant City. Upon information and belief, a review of the relevant dash camera or body camera video will show that Defendant City's officers stopped the vehicle immediately without reasonable suspicion and/or probable cause after seeing it without running the license plate through their MDT or over the radio with dispatch;

f.    Sixth, on or around May 20, 2017 (i.e., later that same day at around 04:18 hours), during the midnight shift, Defendant City's officers wrongly *twice* stopped a citizen who was driving a vehicle with the license plate number DPK6682 without either reasonable suspicion or probable cause. Doing so, after all, is the pattern-or-practice of Defendant City. The first time as the citizen was on his way to Whataburger and the second time on his way back from the fast-food restaurant. The pretext given for the stops was that the license plate on the vehicle did not show confirmed insurance when, however, in reality, it actually did. Upon information and belief, the relevant Defendant City officers were wearing recording body cameras and there was a perfunctory internal affairs investigation into this specific matter. Upon information and belief, relevant Computer-Aided Dispatch Records ("CADS") for these incidents are CAD # 2017-252506 at 0257 and CAD #2017-252528 at 0322. Additionally, the relevant officers were also wearing recording body cameras.

g.    Seventh, on or around June 4, 2017 at approximately 00:57 hours, Defendant City's officers stopped another citizen without any reasons whatsoever as well. Again, doing so and violating the clearly established constitutional rights of civilians is the pattern-or-practice of Defendant City.

h.    Eighth, on or around June 5, 2017, Defendant City's officers stopped another citizen driver during a traffic stop without probable cause or reasonable suspicion because doing so is Defendant City's pattern-or-practice. This time, the driver was informed that the vehicle insurance showed unconfirmed when, in reality, it was actually confirmed.

i.    Ninth, on or around June 11, 2017, Defendant City's officers conducted yet another wrongful traffic stop on a vehicle, and informed the driver that the vehicle insurance was unconfirmed when it was actually confirmed. Again, doing so is the pattern or practice of Defendant City.

j.     Tenth, in or around, June 18, 2017, citizen Jack William Swiggett was again stopped without reasonable suspicion or probable cause and was falsely arrested by the Defendant City of Friendswood on his way home from work while driving along F.M. 528 (also known as E. Parkwood Drive) as he usually does.  Again, this is a small city where police overpoliced a certain roadway.  In fact, in the relevant citizen community, this area is known as "The Danger Zone" as it is well-known by the people of Friendswood that Defendant City's officers camp out there and stop citizens without reasonable suspicion or probable cause.  As such, Jack William Swiggett drove carefully with his cruise control on in order to ensure that he was not speeding.  Available dash camera and body camera video contradicts any and all of the false pretexts that the Defendant City's officers use to justify this stop, and the Defendant City has endorsed this conduct.

k.     Eleventh, on or around July 9, 2017, Defendant City initiated a traffic stop in the 300 block of E Parkwood on a Ford Taurus bearing license plate TX LP-JPP8336 without reasonable suspicion or probable cause because doing so is the pattern-or-practice of Defendant City.  The false pretextual reason for the stop was that the license plate did not match the car when, in fact, it actually did.[1]

51.    Thereafter, on July 25, 2017, after a mere perfunctory investigation into the above-described incidents, Defendant City declared that the involved officers' "***actions [were all] within departmental policy***."  That, after all, is because conducting perfunctory internal affairs investigations is also part of the customs, policies and practices of Defendant City, and such was a force behind Plaintiff's injuries as was the non-disclosure of this *Brady* material.

52.    Upon information and belief following Defendant City's perfunctory internal affairs investigation in mid-2017, the pattern-or-practice continued through then up to mid-2019 for which, when discovery is conducted additional incidents will be discovered.  At this time,

---

[1] Sometime after those incidents, Friendswood/Medic Blake Brazzel witnessed other stops by Defendant City's officers without reasonable suspicion or probable cause.  During one ride-along, Defendant City's officers openly stated that they had no reasonable suspicion or probable cause and pulled over a citizen vehicle for no insurance or something similar.

however, the following additional seventeen (17) incidents which are known and are part of the pattern-or-practice would bring the total to twenty-eight (28):

  a. First, upon information and belief, on or around September 22, 2019, citizen Sarah Lynn Dupuis was stopped without reasonable suspicion and/or probable cause and was falsely detained and/or arrested without reasonable suspicion and/or probable cause pursuant to Defendant City's pattern-or-practice of doing so which resulted in the following case: _State of Texas v. Sarah Lynn Dupuis_, Cause No. 2278943 in the Harris County Criminal Court at Law No. 16, a case which was later dismissed in the interests of justice on the motion of the Harris County District Attorney's Office after it learned the pattern.

  b. Second, upon information and belief, on or around February 7, 2020, citizen Jose N. Sandoval was stopped without reasonable suspicion and/or probable cause and was falsely detained and/or arrested without reasonable suspicion and/or probable cause pursuant to Defendant City's pattern-or-practices of doing so which resulted in the following case: _State of Texas v. Jose N. Sandoval_, Cause No. 2299187 in the Harris County Criminal Court at Law No. 6, a case which was later dismissed in the interests of justice on the motion of the Harris County District Attorney's Office after it learned of the pattern;

  c. Third, upon information and belief, on July 3, 2020, citizen Andrea L. Medel was stopped without reasonable suspicion and/or probable cause and was falsely detained and/or arrested for driving while intoxicated pursuant to Defendant City's pattern-or-practices of doing so which resulted in the following case: _State of Texas v. Andrea L. Medel_, Cause No. 2317232 in Harris County Criminal Court at Law No. 11, a case which was later dismissed on November 21, 2021 in the interests of justice on the motion of the Harris County District Attorney's office after it learned of the pattern;

  d. Fourth, upon information and belief, on or around July 21, 2020, citizen Michael R. Johnson was stopped without reasonable suspicion and/or probable cause and was falsely detained and/or arrested without reasonable suspicion and/or probable cause pursuant to Defendant City's pattern-or-practices of doing so which resulted in the following case: _State of Texas v. Michael R. Johnson_, Cause No. 2319135 in the Harris County Criminal Court at Law No. 13, a case which was later dismissed in the interests of justice on the motion of the Harris County District Attorney's Office after it learned of the pattern;

  e. Fifth, upon information and belief, on or around August 1, 2020, citizen Roque A. Minaya was stopped without reasonable suspicion and/or probable cause and falsely detained and/or arrested for driving while

intoxicated pursuant to Defendant City's pattern-or-practices of doing so which resulted in the following case: *State of Texas v. Roque A. Minaya*, Cause No. 2320292 in Harris County Criminal Court at Law No. 4, a case which was later dismissed in the interests of justice on the motion of the Harris County District Attorney's office after it learned of the pattern;

f.      Sixth, upon information and belief, on October 17, 2020, citizen Marvin J. Vasquez was stopped without reasonable suspicion and/or probable cause and falsely detained and/or arrested for driving while intoxicated pursuant to Defendant City's pattern-or-practices of doing so which resulted in the following case: *State of Texas v. Marvin J. Vasquez*, Cause No. 2329532 in Harris County Criminal Court at Law No. 6, a case which was later also dismissed in the interests of justice on the motion of the Harris County District Attorney's office after it learned of the pattern;

g.      Seventh, upon information and belief, on or around December 19, 2020, citizen Cody A. Bryant was stopped without reasonable suspicion and/or probable cause and falsely detained and/or arrested for driving while intoxicated pursuant to Defendant City's pattern-or-practices of doing so which resulted in the following case: *State of Texas v. Cody A. Bryant*, No. 233662401010 in Harris County Criminal Court at Law No. 1, a case which was dismissed on November 12, 2021 in the interests of justice on the motion of the Harris County District Attorney's office after it learned of the pattern;

h.      Eighth, upon information and belief, on December 29, 2020, citizen Stephanie Ramirez Estrada was stopped without reasonable suspicion and/or probable cause and was falsely arrested for driving while intoxicated pursuant to Defendant City' pattern-or-practices of doing so which resulted in the following case: *State of Texas v. Stephanie Ramirez*, Cause No. 233783801010 in Harris County Criminal Court at Law No. 8, a case which was dismissed on or around November 12, 2021 in the interests of justice on the motion of the Harris County District Attorney's office after it learned of the pattern;

i.      Nineth, upon information and belief, on or around January 24, 2021, citizen Ryan W. Harbuck was stopped without reasonable suspicion and/or probable cause and was falsely detained and/or arrested for driving while intoxicated pursuant to Defendant City's pattern-or-practices of doing so which resulted in the following case: *State of Texas v. Harbuck*, Cause No. 234279501010 in the Harris County Criminal Court at Law No. 10, a case which was dismissed on or around November 12, 2021 in the interests of justice on the motion of the Harris County District Attorney's office after it learned of the pattern;

j.      Tenth, upon information and belief, on or around February 7, 2021, citizen Miguel A. Ortiz was stopped without reasonable suspicion and/or probable cause and was falsely detained and/or arrested without reasonable suspicion and/or probable cause pursuant to Defendant City's pattern-or-practices of doing so which resulted in the following case: _State of Texas v. Miguel A. Ortiz_, Cause No. 234473901010 in the Harris County Criminal Court at Law No. 13, a case which was later dismissed in the interests of justice on the motion of the Harris County District Attorney's Office after it learned of the pattern;

k.      Eleventh, upon information and belief, on or around March 20, 2021, citizen Darcy Linette Swaby was stopped without reasonable suspicion and/or probable cause and was falsely detained and/or arrested pursuant to Defendant City's pattern-or-practices of doing so which resulted in the following case: _State of Texas v. Darcy Linette Swaby_, No. 235026001010 in the Harris County Criminal Court at Law No. 8, a case which was dismissed on or around November 12, 2021 in the interests of justice on the motion of the Harris County District Attorney's Office after it learned of the pattern;

l.      Twelfth, upon information and belief, on or around March 22, 2021, citizen Rajan Katuwal was stopped without reasonable suspicion and/or probable cause and was falsely detained and/or arrested without reasonable suspicion and/or probable cause pursuant to Defendant City's pattern-or-practices of doing so which resulted in the following case: _State of Texas v. Rajan Katuwal_, No. 235066501010 in the Harris County Criminal Court at Law No. 7, a case which was dismissed in the interests of justice on the motion of the Harris County District Attorney's Office after it learned of the pattern;

m.     Thirteenth, upon information and belief, on or around April 2, 2021, citizen Darien S. Guenther was stopped without reasonable suspicion and/or probable cause and was falsely detained and/or arrested without reasonable suspicion and/or probable cause pursuant to Defendant City's pattern-or-practices of doing so which resulted in the following case _State of Texas v. Darien S. Guenther_, Cause No. 235238101010 in the Harris County Criminal Court at Law No. 10, a case which was later dismissed in the interests of justice on the motion of the Harris County District Attorney's Office after it learned of the pattern;

n.      Fourteenth, upon information and belief, on or around April 2, 2021, citizen Darien S. Guenther was stopped without reasonable suspicion and/or probable cause and was falsely detained and/or arrested without reasonable suspicion and/or probable cause pursuant to Defendant City's pattern-or-practice of doing so which resulted in the following case: _State of Texas v. Darien S. Guenther_, No. 235238101010 in the Harris County Criminal

Court at Law No. 10, a case which was later dismissed in the interests of justice on the motion of the Harris County District Attorney's Office after it learned of the pattern;

o.    Fifteenth, upon information and belief, on or around April 5, 2021, citizen Paul E. Merten was stopped without reasonable suspicion and/or probable cause and was falsely detained and/or arrested without reasonable suspicion and/or probable cause pursuant to Defendant City's pattern-or-practices of doing so which resulted in the following case: *State of Texas v. Paul E. Merten*, Cause No. 235276901010 in the Harris County Criminal Court at Law No. 15, a case which was later dismissed in the interests of justice on the motion of the Harris County District Attorney's Office after it learned of the pattern.

p.    Sixteenth, upon information and belief, on or around April 23, 2021, citizen Elizabeth Pina was stopped without reasonable suspicion and/or probable cause and was falsely detained and/or arrested without reasonable suspicion and/or probable cause pursuant to Defendant City's pattern-or-practices of doing so which resulted in the following case: *State of Texas v. Elizabeth Pina*, Cause No. 235552301010 in the Harris County Criminal Court at Law No. 8, a case which was later dismissed in the interests of justice on the motion of the Harris County District Attorney's Office after it learned of the pattern; and

q.    Seventeenth, upon information and belief, on or around June 4, 2021, citizen Anthony L Bell was stopped without reasonable suspicion and/or probable cause and was falsely detained and/or arrested without reasonable suspicion and/or probable cause pursuant to Defendant City's pattern-or-practices of doing so which resulted in the following case: *State of Texas v. Anthony Bell*, Cause No. 236171901010 in the Harris County Criminal Court at Law No. 14, a case which was later dismissed in the interests of justice on the motion of the Harris County District Attorney's Office after it learned of the pattern.

53.    The above referenced cases became more closely scrutinized by the Harris County District Attorney's office after a highly publicized eighteenth (18) incident (or now with the others before the above-described ones a twenty-nineth (29th) one).  That one pertains to a September 15, 2019 incident.   That day citizen Tracy Sean Marshall was stopped and arrested for operating a motor vehicle in a public place while intoxicated.  At his trial in Cause No. MD390019, *State of*

_Texas v. Tracy Marshall_ in Galveston County Court at Law No. 3, Defendant Carter testified that, based on her conduct, she is not a credible witness.

54.     Additionally, later, on or around July 8, 2021 in that same case, Galveston County Court at Law No. 3 ruled that Defendant Carter "***admitted to a course of conduct as an officer that renders her an unreliable and not credible witness***."   Thereafter, the Galveston County District Attorney was prompted to dismiss nearly thirty (30) DWI cases (which are not included in the above described nineteen).   After which Defendant City's relevant policymaker (i.e., the Chief of Police) publicly attacked the judge with his words, and defended his officer as acting within Defendant City's customs, policies or practices.

55.     Thus, upon information and belief, given this pattern of at least thirty (30) incidents and others that will be uncovered in discovery, each containing a sufficiently similar set of facts to the incident involving the Plaintiff, Defendant City has a custom, policy or practice of doing the same to other individuals similarly situated to the Plaintiff, and that was the moving force behind the constitutional violations and injuries suffered by Plaintiff as a result of the incident.

56.     In fact, the Harris County District Attorney's office is also now reviewing more than two-hundred and thirty (230+) arrests connected with Defendant City's police officers.   Upon information and belief, those cases were also the result of a custom, policy or practice of wrongful arrests, illegal searches, and false testimony.

57.     Such a number of incidents is quite telling in a city like Defendant City of Friendswood.   That is because, unlike a major metropolis like the City of Fort Worth or City of Houston for example which each have populations of several millions and hundreds or thousands of officers, the City of Friendswood has only a population of approximately 40,795 citizens and a

meager 65 sworn police officers.  That means a pattern-or-practice can be plausibly established through a lower number of incidents— even though many more will be found in discovery.

## V.    CAUSES OF ACTION

### COUNT 1 – FALSE ARREST
#### (Against Defendant Carter)

58.    The Fourth and Fourteenth Amendments guard against arrests without probable cause.  To prevail on a Fourth Amendment false arrest claim, a plaintiff need only allege: (1) that he was arrested, and (2) the arrest did not have the requisite probable cause.  Here, first, Plaintiff was arrested, and second that arrest did not have the requisite probable cause.

59.    Probable cause exists when all of the facts known by a police officer are sufficient for a reasonable person to conclude that the suspect had committed, or was in the process of committing, an offense.  *Villarreal v. City of Laredo, Tex.*, 17 F.4th 532, 543 (5th Cir. 2021).  Moreover, police officer could not disregard facts tending to dissipate probable cause.  *Bigford v. Taylor*, 834 F.2d 1213 (1988).  Yet, here, Defendant Carter was not in possession of facts sufficient for a reasonable person to conclude that the Plaintiff had committed, or was in the process of committing an offense, and disregarded facts that tended to dissipate probable cause.

60.    As such, the Plaintiff was falsely arrested and thereby suffered injuries.

### COUNT 2 – WARRANTLESS VEHICLE SEARCH
#### (Against Defendant Carter)

61.    The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *See* U.S. CONST. amend. IV.  Pursuant to the Fourteenth Amendment, this applies to state officials, like Defendant Carter.  *See* U.S. CONST. amend. XIV.

62.     At the time of the incidents made the basis of this lawsuit, it was clearly established law that a warrantless search is *per se* unreasonable under the Fourth Amendment.   Here, Defendant Carter violated Plaintiff's constitutional rights by conducting a warrantless search of his vehicle without probable cause to do so.

### COUNT 3 – ILLEGAL BLOOD SEARCH
### (Against Defendant Carter)

63.     Under <u>*Franks v. Delaware*</u>, 438 U.S. 154 (1978), a plaintiff need only show: (1) the affiant, in support of the warrant, included a false statement knowingly and intentionally, or with reckless disregard for the truth, and (2) the allegedly false statement is necessary to the finding of probable cause.   <u>*Winfrey v. Rogers*</u>, 901 F.3d 483 (5th Cir. 2018).   Likewise, the intentional or reckless omission of material facts from a warrant application may amount to a Fourth Amendment violation.   <u>*Kohler v. Englade*</u>, 470 F.3d 1104, 113 (5th Cir. 2006).   And, qualified immunity does not protect officers who maliciously or recklessly represent or omit material information to procure a warrant.   <u>*Kugle v. Shields*</u>, 62 F.3d 395 (5th Cir. 1995).

64.     Here, upon information and belief, first, Defendant Carter included false statements knowingly and intentionally or with reckless disregard for the truth in her application for a blood search warrant of the Plaintiff.   Second, her false statements were necessary to the finding of probable cause.   In addition or alternatively, Defendant Carter intentionally or recklessly omitted material facts from her warrant application such as the Plaintiff's willingness to breathe into a machine and her refusal to allow him to do so.   Given so, qualified immunity does not protect Defendant Carter from her malicious or reckless representations or omissions of information in order to procure a blood search warrant.

## COUNT 4 – WRONGFUL PRETRIAL DETAINMENT
### (Against Defendant Carter)

65.     The initiation of criminal charges without probable cause may set in force events that run afoul of explicit constitutional protections.  *Winfrey v. Rogers*, 901 F.3d 483, 491 (5th Cir. 2018) (quoting *Castellano v. Fragozo*, 352 F.3d 939, 945, 953 (5th Cir. 2003) (en banc), *cert. denied*, 139 S.Ct. 1549 (2019).  When an officer, like Defendant Carter, is tasked with presenting information to a neutral magistrate so that he or she can make a probable cause determination, the officer cannot provide the magistrate with false and misleading statements or make material omissions.  *See Franks*, 483 U.S. at 154, 155-56; *Winfrey v. Rogers*, 901 F.3d at 494; *see also Hernandez*, 397 F. App'x at 965.

66.     Here, Defendant Carter, through material omissions or otherwise, made false statements knowingly and intentionally, or with reckless disregard for the truth to the Honorable Magistrate Judge James W. Woltz so that he could make a probable cause determination as to the arrest of the Plaintiff.  Defendant Carter, however, provided the Honorable Magistrate Judge James W. Woltz with false or misleading statements or made material omissions.  Tainted by Defendant Carter's testimony, the Honorable Magistrate Judge James W. Woltz found probable cause for further detention.

67.     Consequently, Plaintiff was furtherly detained against his rights.

## COUNT 5 – TAINTED GRAND JURY INDICMENT
### (Against Defendant Carter)

68.     An arresting officer, like Defendant Carter, is still liable for the constitutional violations herein complained of despite any subsequent grand jury indictment "if the plaintiff shows that the deliberations of that intermediary were in some way tainted by the actions" of the officer.  *McLin v. Ard*, 866 F.3d 682, 689 (5th Cir. 2017).  After all, any misdirection of the grand

jury by omission or commission perpetuates the taint of the original official behavior. *Hand v. Gary*, 838 F.2d. 1420, 1428 (5th Cir. 1988). Moreover, upon information and belief, Defendant Carter provided false testimony to the grand jury.

**COUNT 6 – MUNICIPAL LIABILITY**
**(Against Defendant City)**

69.     A city may be directly liable under *Monell v. Dep't of Soc. Servs*., 436 U.S. 658 (1978). For such, Plaintiff need only show (1) an official policy or custom, (2) that a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose moving force is that policy or custom. *Moore v. LaSalle Management*, No. 20-30739 (5th Cir., July 22, 2022 *reh'g denied*)at Pg. 21 ¶ 2; *Bishop v. Arcuri*, 674 F.3d 456, 467 (5th Cir. 2012, *reh'g denied*); *Releford v. City of Houston*, No. 4:14-CV-2810 (S.D. Tex., Feb. 29, 2016) at Pg. 7 # B.

70.     Such elements can be established through the presentation of a pattern of incidents, and the number of incidents required to do so is considerably less than what it would be for a city, like the City of Houston or City of Fort Worth. Here, upon information and belief, Defendant City of Friendswood has only a population of approximately 40,795 citizens and a meager 65 sworn police officers as opposed to millions of civilians and thousands of officers.

71.     Under *Monell*'s first element, the pattern-or-practice of Defendant City includes tolerating, endorsing and/or being deliberately indifferent to any or all of the following:

       a.    The pulling over of civilians for traffic stops without reasonable suspicion or probable cause;

       b.    The performance of unwarranted field-sobriety tests without reasonable suspicion or probable cause;

       c.    The searching for post-facto reasons to justify a stop that was improperly previously made;

       d.    The performance of warrantless vehicle searches without reasonable suspicion or probable cause;

25

e.  The questioning un-Mirandized civilians without duly informing them of their rights to remain silent;

f.  The submission of tainted affidavits or providing false testimony to independent intermediaries to obtain probable cause warrants;

g.  The conducting illegal blood searches of civilians;

h.  The falsely arresting civilians without probable cause and/or reasonable suspicion;

i.  Performing but mere perfunctory Internal Affairs investigations into officers alleged to have done the above; and

j.  The withholding of _Brady_ material which could go to officers' credibility, untruthfulness, and routine baseless traffic stops.

The pattern showing the above was so pervasive that it could include up to or more than two-hundred (230+) incidents.  In fact, so concerning has this custom, policy or practice become, that the Galveston County District Attorney's office has dismissed at least thirty (30) DWI cases as a result, and another 230+ incidents are under review by the Galveston County District Attorney's Office.  Specific incidents beyond these raw numbers have been so above pled as well.

72.  Under _Monell_'s second element, the relevant policymaker for Defendant City of Friendswood is its Chief of Police and/or City Council.  A policymaker is an individual who takes the place of the governing body in a designated area of city administration.  _Zarnow v. City of Wichita Falls Tex._, 614 F.3d 161, 167 (5th Cir., 2010) (finding the police chief to be a defendant Texas city's policymaker).  He or she decides the goals for a particular city function and devis[s] means of achieving those goals.  _See e.g., Cole v. Brazos County, Tex._ 981 F.2d 237, 245 (5th Cir. 1993).  Upon information and belief, Defendant City's Chief of Police decides the goals for Defendant City of Friendswood law enforcement activities and devises means of achieving those goals.  The mere existence of oversight over a chief of police by a city council is not enough to

negate the idea that said individual is not a relevant policymaker.  That is because continuous refusal to exercise some theoretical authority to review a municipal official's policy decisions will, at some point, establish a municipal official as the final policymaking authority by custom or usage having the force of state law.  Here, Defendant City of Friendswood had notice through its officers' body camera videos, incident reports, Internal Affairs investigations, audits, criminal case dismissals, and the large number of incidents for such a smaller police force.  An additional reason for attribution to Defendant City of Friendswood through Defendant City of Friendswood's Chief of Police is his highly publicized defense of his officers before an agreeing City Council and Mayor.

73.     Under *Monell's* third element, the deprivation that Plaintiff endured was to the custom.  Defendant City of Friendswood's prior Internal Affairs Investigations into the officers that engaged in the above detailed custom was merely perfunctory.  Indeed, there had been prior internal affairs complaints against the same officers.  In fact, there had been a pattern of complaints by other civilians as well.  Thus, respectfully, Defendant City of Friendswood's custom was a moving force behind Plaintiff's injuries.

## COUNT 7 - FAILURE TO TRAIN
### (Against Defendant City)

74.     To show a failure-to-train, Plaintiff need only show that (1) the police chief failed to train the officer, (2) a causal connection existed between the failure to train and the violation of the plaintiff's rights, and (3) the failure to train amounted to deliberate indifference to the plaintiff's constitutional rights. *Hobart v. Estrada*, 582 F. App'x 348, 356 (5th Cir. 2014).  Such can also be shown through "a pattern of similar violations." *Id*.

75.     Here, first, Defendant Police Chief failed to train Defendant Carter.  Defendant Carter did not receive any training whatsoever, or alternatively, the training that she did receive

was deficient.  In particular, Defendant Carter was not properly trained as to what was required for reasonable suspicion, what is required to initiate a field-sobriety test, or even how to properly conduct a field-sobriety test, and other key areas required for performance of her job as a police officer.  Second, there is a causal connection between that failure to train and the violation of Plaintiff's constitutional rights.  Third, that failure to train amounted to deliberate indifference to the Plaintiff's constitutional rights.

76.     More precisely, there was a pattern of incidents from or before 2017 up to the date of the incident at issue in this lawsuit.  Since at least 2017, Defendant City's Chief of Police knew that Defendant Carter routinely initiated traffic stops without reasonable suspicion or probable cause but allowed her to continue doing so.  Moreover, he also knew that Defendant Carter was not a credible officer who routinely omitted key details and provided false testimony.  Given so, this deliberate indifference was a moving force in the constitutional violations suffered by the Plaintiff.

**COUNT 7 - FAILURE TO SUPERVISE**
**(Against Defendant City)**

77.     To show a failure-to-supervise, Plaintiff need only show that (1) "the police chief failed to supervise," (2) "a causal connection between the failure to supervise and the violation of the plaintiff's rights," and (3) "such failure to supervise… amounted to gross negligence or deliberate indifference." _Doe v. Taylor Independent School Dist._, 15 F.3d 443, 452 (5th Cir. 1994)., 443.  To that end, the Fifth Circuit has never required that a supervisory official be warned of the precise act that the subordinate official subsequently commits, rather, all that the Fifth Circuit (and the Supreme Court) requires is that supervisory officials just be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists.  _Smith v. Brenoettsy_, 158 F.3d 908, 912 (5th Cir. 1998).  Here, from body camera videos, citizen complaints, prior internal

affairs investigations, audits, arrest reports, lab tests, conversations between officers, and other related documents a reasonable jury could find that Defendant City, its Chief of Police and other supervisory officials were on notice of a pattern of incidents involving Defendant Carter.

78.     Liability of the municipality here depends upon if it should have been obvious to Defendant City's Chief of Police— or stated differently, whether Defendant City's Chief of Police had sufficient notice— that the failure to supervise the Defendants was likely to lead to a violation of the Fourth Amendment rights of those citizens that they would encounter. *Compare Brown v. Bryan County*, 219 F.3d 459, 460 (5th Cir. 2000). To which, two things may be of importance. The first is whether it should have been obvious to Defendant City's Chief of Police that the highly predictable consequence of not supervising Defendant Carter was that Defendant Carter would falsely arrest citizens like the Plaintiff; and the second is that this failure to supervise was a "moving force" with a causal connection to the constitutional injury. *Brown*, 462 (5th Cir. 2000). Here, considering the above and the pattern it was a highly predictable consequence, and such was a moving force behind the Plaintiff's injuries.

## VI.    DAMAGES

79.     Defendants are jointly and severally liable for the wrongs complained of, either by virtue of direct participation or by virtue of ordering, encouraging, aiding, abetting, committing, and/or ratifying and condoning the commission of the above-described acts and/or omissions.

80.     Plaintiff suffered compensatory, special, and punitive damages for the following:

     a.      Extreme mental anguish and emotional distress;

     b.      Lost wages and loss of earnings capacity;

     c.      Loss of enjoyment of life;

     d.      Pain and suffering;

e.      Violations of his constitutional rights by Defendants; and

f.      Reasonable and necessary attorneys' fees incurred.

## VII.   <u>PUNITIVE DAMAGES</u>

81.     Punitive damages may be awarded in § 1983 cases involving egregiously harmful intent, callousness or recklessness.  Said punitive damages are recoverable for the egregious acts and omissions of Defendant Carter.  To the extent this request conflicts with <u>*Newport v. Fact Concerts*</u>, 453 U.S. 247, 101 S. Ct. 2748 (1981), Plaintiff disclaims those requests.

## VIII.   <u>JURY DEMAND</u>

82.     Plaintiff respectfully demands that this action be heard before a jury.

## IX.   <u>PRAYER</u>

For all the foregoing reasons, Plaintiff Jonathan Edward Little prays for judgment against all Defendants jointly, severally and in solidarity, as follows:

a.      compensatory, special and punitive damages;

b.      the cost of this action and reasonable attorneys' fees as provided by 42 U.S.C. §1988;

c.      pre-judgment and post-judgment interest;

d.      trial by jury; and

e.      such other and further relief, at law and in equity, that the Honorable Court deems just and equitable.

[SIGNATURE BLOCK ON FOLLOWING PAGE]

Respectfully submitted,

**THE SHARIFF LAW FIRM**

By: _____
        **M. Obaid Shariff**
        Federal I.D. No. 2827312
        Texas Bar No. 24091135
        mshariff@shariﬄawfirm.com
        **Kevin Acevedo**
        Federal ID No. 2932922
        Texas Bar No. 24086848
        kacevedo@shariﬄawfirm.com

        2500 West Loop South, Suite 300
        Houston, Texas 77027
        (713) 244-8392 (Telephone)
        (713) 244-8372 (Fax)
        **ELECTRONIC SERVICE VIA:**
        eservice@shariﬄawfirm.com

        **ATTORNEYS FOR PLAINTIFF**
        **JONATHAN EDWARD LITTLE**